Filed 2/8/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 27

Community Homes of Bismarck, Inc., Plaintiff and Appellee

v.

Iris Main, Defendant and Appellant

No. 20100095

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Bruce B. Haskell, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Deborah Joan Carpenter, 2039 Kavaney Drive, Bismarck, N.D. 58501, for plaintiff and appellee.

Bradley D. Peterson (argued) and Meredith Vukelic (appeared), P.O. Box 2419, Bismarck, N.D. 58502-2419, for defendant and appellant.

Community Homes of Bismarck v. Main

No. 20100095

Crothers, Justice.

[¶1] Iris Main appeals from a district court judgment evicting her from an apartment owned by Community Homes of Bismarck, Inc., after the district court found she materially breached her rental agreement with Community Homes.  We conclude the district court did not clearly err in finding Main materially breached her rental agreement with Community Homes.  We affirm.

I

[¶2] In June 2009, Main’s application for public housing assistance through Burleigh County Housing Authority was denied on the ground she owed a prior landlord “$1,244.55 for unpaid rent, damages and/or move-out charges,” which “occurred while on assistance” in 2001.  Main requested an informal hearing for the denial of public housing assistance.  Main appeared at a June 25, 2009 informal settlement conference with her caseworker from the Abused Adult Resource Center, and Cheryl Tryhus appeared at the conference for the Burleigh County Housing Authority and Community Homes.  Counsel for Community Homes served as the conference officer at the informal settlement conference, and a July 6, 2009 letter prepared by counsel summarized the proceeding:

“[Main] admitted she had owed the money, but that such charges stemmed from the time she lived with her husband. . . .  He was very abusive, and the parties are now legally divorced.  She is trying to get her ‘credit restored’, and is trying to put her life back together for herself and her three children.  Most of the charges stemmed from damages to the carpet and the unit caused by her husband, and she does not know if the landlord has pursued anything against him, as he is in prison again. [Main’s caseworker] states [Main] is ‘a completely different person’ from when she was with her abuser, and that she is ‘always good about following through’ with what needs to be done.”

[¶3] The July 6, 2009 letter stated that in order to receive public housing assistance, Main accepted Community Homes’ offer to “resolve the [unpaid rent] issue” with her prior landlord, and if she resolved the issue with a repayment agreement, she was required to provide the Burleigh County Housing Authority with a written receipt evidencing appropriate payment by the last day of each month until the repayment agreement was paid in full.  The letter stated that if Main violated any terms of her agreement, the lease would be terminated.  Main and a collection agency for her prior landlord agreed to settle the prior debt for $629, with Main agreeing to pay the collection agency $100 per month starting by July 7, 2009.  Main executed a written lease with Community Homes on July 23, 2009, and she received public housing assistance to lease an apartment from Community Homes.  Main made payments to the collection agency through July 29, 2009, in three installments totaling $100, and she provided Community Homes with receipts for her payments.

[¶4] In September 2009, Community Homes notified Main that she had failed to make her August and September payments to the collection agency or to provide appropriate documentation for the payments and that Community Homes required her to vacate the premises.  In October 2009, Community Homes served Main with a written notice of intention to evict, and in November 2009, Community Homes brought this action to evict Main, alleging she had breached a material provision of her lease or written agreement with Community Homes.  Main claimed she lost her job and was unable to pay both her monthly rent to Community Homes and the past-

due amount to the collection agency.  She also claimed she had twelve months to repay the debt to the collection agency.

[¶5] At trial, Tryhus, a paralegal for Community Homes, and Nicole Schurhamer, the project manager for Community Homes, testified using documents containing prepared questions and answers.  Each testified they had prepared the answers to the questions on their respective documents.  After each witness testified, the court allowed Main to review the documents for cross-examination, and Main had each document admitted into evidence.  Main also presented evidence the collection agency for her prior landlord agreed to not pursue any further collection action against her “based upon . . . information that she is indigent.  She had made voluntary payments beginning in July, 2009, and then stopped.”  The district court entered judgment evicting Main from the apartment, finding she materially breached her lease with Community Homes by failing to comply with the requirement to resolve the unpaid rent issue with her prior landlord.  The court found Main’s belief that she had twelve months to repay her prior landlord was not reasonable.

II

[¶6] Main argues the district court denied her a fair trial by allowing Community Homes’ employees Tryhus and Schurhamer to testify verbatim from documents not in evidence, without showing their memories needed refreshing.  Main asserts Community Homes failed to use the correct procedure for refreshing the witnesses’ memory and the district court’s decision violated her constitutional right to due process and a fair trial.  Main argues the court misapplied the law in allowing the witnesses to testify and in denying her motion to strike the witnesses’ testimony.  She argues Community Homes cannot show the error is harmless because its entire case consisted of the tainted testimony of those two witnesses.

[¶7] During Community Homes’ direct examination of Tryhus, the following colloquy occurred:

“MR. PETERSON:  Your Honor, maybe I'm wrong but it appearsthat the witness is testifying from a document. Could I have access to that document?

“WITNESS: It’s my notes.

“THE COURT:  Well if you’re using that to testify, he has the right to access those documents, so if you don’t want him to look at it, then don’t testify from it.  Otherwise, he gets the right to do that.

“Q. Are you going to be able answer from your memory? “A.

Not dates, no, but can I look at my file?

“MR. PETERSON:  I guess I’d like to have access to what she’s testifying from.

“THE COURT:  Well the rules are ma’am, that if you’re using any documents for your testimony, then the other side gets full access to those documents.

“WITNESS:  Okay.

“THE COURT:  So that’s—and I guess I’m not sure Mr. Peterson, if you want to take a break and look at her stuff or what.

“MR. PETERSON:  I guess we can wait until after she’s donetestifying, Your Honor.”

[¶8] After Community Homes completed its direct examination of Tryhus, the court granted Main a ten-minute recess to review Tryhus’s documents and thereafter permitted her to cross-examine Tryhus about the documents, which consisted of typed questions and answers with some handwritten notes.  Tryhus testified she prepared the answers to the questions prepared by Community Homes’ attorney.  Main then moved to strike Tryhus’s testimony:

“MR. PETERSON:  Your Honor, I move to strike this testimony.This is a script that she worked off of.  There’s no way this rises to due process and fairness.  Her testimony was—well I guess I’ll admit it as an exhibit. If I might approach,  Your Honor?

. . . .

“THE COURT:  I’m not sure I see what the problem is.

“MR. PETERSON:  Your Honor, all of the answers were typed out.  All the questions were typed out, the answers were typed out ahead of time with her attorney directing her testimony.

“THE COURT:  So you’re saying that attorneys shouldn’t talk to their witnesses prior?

“MR. PETERSON:  I actually encourage it Your Honor.  My concernis she had the answers prepared and sitting in front of her.  This is cheating on a test.  She’s not testifying from memory, she’s reading off a script.

“THE COURT:  Well you have the opportunity to cross examine all her answers and if there’s something that is wrong with the answers, fine.  I mean I understand your argument and it’s kind of unusual that that is done that way but I just don’t see how—it certainly doesn’t rise to a due process violation.  I mean the fact that she is answering the way her lawyer is expecting her to answer, I just don’t see that it’s a problem.

“MR. PETERSON:  Your Honor, it’s not how her lawyer expects, it’s how her lawyer typed it out for her.

. . . .

“THE COURT:   I understand what your argument is, is that normallypeople don’t sit up there with a script or whatever wording you want to use, where the question comes and the answer is, but to me it’s no different than sitting down with your lawyer and thoroughly preparing and saying I’m going to ask you this, what’s your answer going to be to that. I just don’t see the difference.  The only difference is that it’s in writing, which I agree is unusual and maybe if this was a jury trial, the jury might not like that very well, but I just don’t see that it rises to any level of violation of any of your client’s rights.  Again, I’m getting repetitive, but to me there’s no difference between that and a lawyer that sits down and thoroughly prepares her client for what the questionsare going to be and what she expects the answers to be.  If you want to introduce it into evidence in the form of an offer of proof or whatever to preserve the record you can certainly do that . . . and I’ll allow that as an exhibit.”

Main thereafter introduced into evidence the document used by Tryhus during her testimony.

[¶9] During Community Homes’ direct examination of Schurhamer, the following exchange occurred:

“MS. CARPENTER:  If I might provide the witness a copy of the file Your Honor?

“THE COURT:  All right.  Well again, Mr. Peterson would have access to that.

“MR. PETERSON: I guess my question is do you also have a script Ms. Schurhamer?

. . . .

“THE COURT:  I think I made clear my—it doesn’t matter.

“MR. PETERSON:  Well I would like to have it I guess for my purposes so I can read along with her testimony.

“THE COURT: All right.

“MS. CARPENTER:  She is not testifying from any kind of notes.

“THE COURT:  All right.”

During Main’s cross-examination of Schurhamer, the following exchange occurred:

“Q. [Mr. Peterson] And then I guess I’ve noticed a couple times you were looking down—were you using notes to testify today?

“A. No, it’s just what my duties are.

“Q. Who prepared that for you?

“A. I did.

“Q. Did you provide that to your attorney as well?

“A. Yes.

“MR. PETERSON:  May I see it, Your Honor?

“THE COURT:  Mm hmm.

“MR. PETERSON:  Approach?

“THE COURT:  Sure.

“Q. And then what regarding these did you also testify off of?

“A. Oh these are not mine.

“Q. So you didn’t have a script like this?

“A. No.

“Q. Okay. Who typed this up?

“A. My paralegal typed it.

“Q. And who—with regard to the questions, the dark part, was that your answers to those questions?

“A. Yes.

“Q. Who asked you to prepare this document?

“A. My paralegal.

“Q. Okay, so it was made in anticipation of the hearing today?

“A. Yes.

“MR. PETERSON:   I would offer this as an exhibit, Your Honor.

“THE COURT:  Okay.  Have it marked please.

“MS. CARPENTER:  Fine.

“MR. PETERSON:  I would offer exhibit—Defendant’s Exhibit Number 5, Your Honor.

“THE COURT:  Any objection Ms. Carpenter?

“MS. CARPENTER:  None.

“THE COURT:  Thank you, 5 is received.

“MR. PETERSON:  I have nothing further Your Honor.”

[¶10] Under N.D.R.Ev. 602, a witness may not testify to a matter unless sufficient evidence is presented to show the witness has personal knowledge of the matter.  Rule 612, N.D.R.Ev., deals with witnesses using a writing to refresh their memory while testifying and entitles the adverse party to have the writing produced at trial.  Under N.D.R.Ev. 612(c), “[a] party entitled to have a writing or object produced under this rule is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.”

[¶11] Rule 612, N.D.R.Ev., is substantially similar to F.R.Ev. 612, 
see
 
Farm Credit Bank v. Huether
, 454 N.W.2d 710, 718 n.9 (N.D. 1990), and we may use persuasive federal authority to construe our rule.  
State v. Saulter
, 2009 ND 78, ¶ 10, 764 N.W.2d 430.  Under F.R.Ev. 612, a proper foundation must be established before witnesses may refer to notes or to other materials to refresh their memory.  
Hall v. American Bakeries Co.
, 873 F.2d 1133, 1136 (8th Cir. 1989).  First, witnesses must show a need to refresh their memory, and second, witnesses must confirm that the notes will assist them in refreshing their memory.  
Id.
  Witnesses may not testify directly from the notes, but can use the notes to assist in their recollection.  
Id.
  A district court has broad discretion to control the use of evidence to refresh memory and determine whether witnesses are using a writing to refresh their memory, or whether they are effectively offering the writing for its truth.  
United States v. Rinke
, 778 F.2d 581, 587 (10th Cir. 1985); 
United States v. Boyd
, 606 F.2d 792, 794 (8th Cir. 1979).  
See
 
State v. Knoefler
, 325 N.W.2d 192, 200 (N.D. 1982) (court has discretion under N.D.R.Ev. 612(b) to decide if interests of justice require production of document used by witness to refresh memory before testifying).  “‘A district court abuses its discretion when it acts arbitrarily, unconscionably, or unreasonably, when its decision is not the product of a rational mental process leading to a reasoned determination, or when it misinterprets or misapplies the law.’”  
Saulter
, at ¶ 9 (quoting 
City of Fargo v. Levine
, 2008 ND 64, ¶ 5, 747 N.W.2d 130).

[¶12] Here, this issue was first raised in the district court after Main observed Tryhus “testifying from a document.”  Main did not object to the testimony but did request a copy of the document Tryhus was using.  Main later objected and the court used a procedure paralleling N.D.R.Ev. 612(c) for Main to review the documents and cross-

examine the witnesses. Although the usual foundational requirements for refreshing a witness’s memory were not initially followed as each witness testified, the record reflects the district court exercised control over the procedure to ensure fairness when Main raised the issue.  This Court has recognized that “‘[a] person is denied due process when defects in the procedure employed might lead to a denial of justice,’” and that “[n]otice and an opportunity to be heard are fundamental requirements of due process.”  
State v. Sorenson
, 2009 ND 147, ¶ 38, 770 N.W.2d 701 (quoting 
State v. Ehli
, 2003 ND 133, ¶ 10, 667 N.W.2d 635).  Main was provided an opportunity to review each document and to cross-examine both witnesses about their testimony and the documents.  This record reflects Main was provided a fair and meaningful opportunity to respond to the witnesses’ testimony, and we reject her claim the court’s decision violated her right to due process or a fair trial.  In view of the posture in which this issue was raised in the district court, we cannot say the court’s decision was arbitrary, unconscionable or unreasonable, or was a misapplication of the law.  The court did not abuse its discretion in refusing to strike the witnesses’ testimony.

III

[¶13] Main argues the district court erred in finding she breached a material provision of her lease with Community Homes.  She argues the applicable regulations authorize eviction only if she owes money to Community Homes, and she claims she does not.  Main argues she does not currently owe rent or money to a Public Housing Authority and her debt to her prior landlord does not require reimbursement to a Public Housing Authority.  She does not dispute the July 6, 2009 letter memorializing the June 25, 2009 informal settlement conference is part of her rental agreement with Community Homes, but argues that agreement is not enforceable because any debt to her prior landlord was incurred in 2001 and was barred by the statute of limitations.  She also claims her consent to the agreement was obtained under voidable economic duress.

[¶14] Community Homes’ complaint alleged Main “violated the lease by breach of material provision of the lease or written agreement.”  Under 24 C.F.R. § 247.3(a) (2010), a landlord may terminate any tenancy in a subsidized housing project for “[m]aterial noncompliance with the rental agreement.”  The federal regulations define “rental agreement” to mean “all agreements, written or oral, between the landlord and tenant . . . relating to the use and occupancy of a dwelling unit and surrounding premises.”  24 C.F.R. § 247.2 (2010).  Material noncompliance with a rental agreement includes “[n]on-payment of rent or any other financial obligation due under the rental agreement.”  24 C.F.R. § 247.3(c)(4) (2010).

[¶15] Here, Main initially was denied public housing assistance in June 2009 because she owed a prior landlord “$1,244.55 for unpaid rent, damages and/or move-

out charges,” which “occurred while on assistance.”  
See
 24 C.F.R. § 960.203(c)(1) (2010) (Public Housing Authority may consider all relevant information in determining suitability for tenancy, including an applicant’s past performance in meeting financial obligations, especially rent); 24 C.F.R. § 982.552(c)(vi) (2010) (Public Housing Authority may deny program assistance to an applicant “[i]f the family has not reimbursed any [public housing authority] for amounts paid . . . under a [housing assistance payment] contract for rent, damages to unit, or other amounts owed by family under lease”).  The denial of assistance reflects that Main had been on assistance when she incurred the debt to the prior landlord.  As part of an informal hearing process to obtain public housing assistance, Main agreed to “resolve the [unpaid rent] issue” with her prior landlord, and she executed a written agreement with a collection agency for her prior landlord to settle the debt for $629, with Main agreeing to pay the collection agency $100 per month starting on July 7, 2009.  Main does not claim her agreement to pay the collection agency is not part of her rental agreement with Community Homes.  Rather, she argues her obligation to her prior landlord is not legally enforceable because it is barred by a six-year statute of limitations for actions upon a contract.  However, a new written promise to pay a debt may revive the debt and remove a statute of limitations bar.  N.D.C.C. § 28-01-36; 
Pear v. Grand Forks Motel Assoc.
, 553 N.W.2d 774, 782 (N.D. 1996).  In resolving the prior unpaid rent issue, Main executed a June 25, 2009 agreement to pay $100 per month toward the debt to the prior landlord, reviving her debt with her prior landlord and removing any statute of limitations claim she may have had.

[¶16] Main also claims her consent was obtained under economic duress.  This Court has recognized that “[t]he doctrine of economic duress has not been expressly adopted in North Dakota as a defense to enforcement of a contract.”  
Mellon v. Norwest Bank
, 493 N.W.2d 700, 703 (N.D. 1992).  In 
Mellon
, we did not decide if N.D.C.C. § 9-03-

05 encompassed “economic” duress, but concluded, even if it did, the plaintiff could not establish a requisite element of economic duress because the circumstances in that case permitted other alternatives to accepting a price increase and signing a contract.  493 N.W.2d at 703-04.  Similarly, even if N.D.C.C. § 9-03-05 encompasses “economic” duress, Main’s agreement with Community Homes did not require her to pay her prior landlord.  Rather, the agreement required her to “resolve the [unpaid rent] issue,” and her application for public housing was not conditioned on paying a debt that may have been barred by the statute of limitations.  Under these circumstances, we conclude Main’s decision to resolve the unpaid rent issue by repayment cannot be deemed the result of economic duress.

[¶17] Main also argues she was denied due process and an impartial decision maker by the dual role of Community Homes’ attorney as the “decision maker at the informal hearing” and as her opposing party’s attorney in the eviction proceeding.

[¶18] We have recognized that due process entitles litigants to an impartial tribunal, but a litigant is not denied due process or a fair hearing because an agency performs the functions of investigation, prosecution and adjudication.  
State v. Brewer
, 444 N.W.2d 923, 924-26 (N.D. 1989); 
State v. Anderson
, 427 N.W.2d 316, 320 (1988); 
First Am. Bank & Trust Co. v. Ellwein
, 221 N.W.2d 509, 517 (N.D. 1974).  The record reflects that at the June 25, 2009 informal settlement conference, counsel for Community Homes was the “informal conference officer.”  
See
 24 C.F.R. § 966.54 (2010) (procedure for informal settlement of grievance).  The informal settlement conference resulted in an “offer [of] a resolution” by Burleigh County Housing Authority, which Main accepted.  Nothing in this record establishes that counsel for Community Homes was the decision maker either at the informal settlement conference or in this eviction proceeding, and we reject Main’s claim that counsel’s participation in that proceeding and representation of the opposing party in this action denied Main a fair trial or violated her due process rights.  
See
 
Anderson
, at 320 n.2 (local school board had no decision-making function and was not financially interested in deciding whether student may be excused from public school attendance).

[¶19] “Whether a party has breached a lease is a finding of fact.”  
Peterson v. Front Page, Inc.
, 462 N.W.2d 157, 158 (N.D. 1990).  “We will not reverse the trial court’s findings of fact unless clearly erroneous.”  
Id.
  In 
Edward H. Schwartz Constr., Inc. v. Driessen
, we described our limited scope of review under the “clearly erroneous” rule:

“‘A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction the trial court made a mistake.  A trial court’s choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court.  On appeal, we do not reweigh conflicts in the evidence, and we give due regard to the trial court’s opportunity to judge the credibility of the witnesses.’”

2006 ND 15, ¶ 6, 709 N.W.2d 733 (quoting 
Brandt v. Somerville
, 2005 ND 35, ¶ 12, 692 N.W.2d 144).

[¶20] Main does not dispute that her rental agreement with Community Homes included the requirements to resolve the unpaid rent issue and to provide appropriate receipts to Community Homes.  A landlord may terminate a tenancy in a subsidized housing project for “[m]aterial noncompliance with the rental agreement,” which includes “[n]on-payment of rent or any other financial obligation due under the rental agreement.”  24 C.F.R. § 247.3 (2010).  Evidence in this record establishes Main failed to timely pay the financial obligation to the collection agency, which was due under the rental agreement and failed to provide appropriate receipts to Community Homes.  We are not left with a definite and firm conviction the district court made a mistake in finding Main materially breached her rental agreement with Community Homes.  We therefore conclude the court’s finding of a material breach of the rental agreement is not clearly erroneous.

IV

[¶21] We affirm the eviction judgment.

[¶22] Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.